UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ROSE ST. CYR, | : | Hon. Joseph H. Rodriguez |
| Plaintiff, | : | Civil Action No. 10-5868 |
| v. | : | MEMORANDUM OPINION |
| | | & ORDER |
| BRANDYWINE SENIOR LIVING, LLC, | : | |
| Defendant. | : | |

This matter is before the Court on Defendant's motion for summary judgment.
Oral argument on the motion was heard on May 15, 2012, and the record of that
proceeding is incorporated here.  For the reasons expressed on the record, and those
outlined below, Defendant's motion will be granted in part and denied in part.

**Background**

Plaintiff Rose St. Cyr is a former employee of Defendant Brandywine Senior
Living, LLC.  She brings claims against her former employer pursuant to the Family and
Medical Leave Act of 1993, 29 U.S.C. § 2601 ("FMLA"), and the New Jersey Law Against
Discrimination, ("NJLAD").  In short, Plaintiff alleges that (1) Defendant interfered with
her right to take FMLA leave and terminated her in retaliation for exercising her rights
under the FMLA; (2) Defendant failed to accommodate Plaintiff's disability and
terminated her because of her disability in violation of the NJLAD; and (3) Plaintiff was
terminated because of her African-American race in violation of the NJLAD.

Defendant provides assisted living services to elderly residents.  Plaintiff began
working for Defendant in July of 2006 at its Moorestown, New Jersey facility,
Brandywine Senior Living at Moorestown Estates,  as a Certified Nursing Assistant or
"CNA" in the Reflections Unit, which serves residents with Alzheimer's disease and

dementia.  (Murphy Decl., Ex. A, Boyette Decl., Ex. E, St. Cyr Dep., p. 16-17, 31, 73, 77,

87.)  At all relevant times, Plaintiff's shift was 10 p.m. to 6 a.m.  (St. Cyr Dep., p. 87.)

Pursuant to Defendant's Progressive Discipline Policy[1], on January 4, 2010,

Plaintiff received a verbal warning for excessive call-outs.  (Murphy Decl., Ex. J.)  The

same day, Plaintiff was suspended pending investigation for not answering a door alarm

that was sounding in the Reflections Unit December 29 into December 30, 2009.

(Murphy Decl., Ex. L.)  On January 7, 2010, upon completion of the door alarm

investigation, Plaintiff was discharged for failing to ensure the safety of Defendant's

residents, showing unsafe resident practices, and insubordination to her direct

supervisor.  (Murphy Decl., Ex. M.)  On February 5, 2010, Defendant reinstated Plaintiff

to her former position as care manager pursuant to a "Reinstatement Agreement,"

whereby Plaintiff was placed on probation for a period of ninety days beginning

February 7, 2010.  (Murphy Decl., Ex. N.)  Under the Agreement, Plaintiff agreed that

"Any violation of work rules or absenteeism will be cause for immediate termination."

(Id.)  On April 14, 2010, Plaintiff was placed on final written warning for yelling at her

direct supervisor, Wellness Director Marilyn Morales, and treating Morales in a

disrespectful manner on April 12, 2010.  (Murphy Decl., Ex. O., Boyette Decl., Ex. O.)

In or around August 2010, Plaintiff was examined by Dr. David G. Nazarian, an

---

[1]  Upon an employee's first offense, he or she is required to undergo a counseling
session.  Upon the employee's second offense, he or she receives a verbal warning.  Upon
an employee's third offense, he or she receives a written warning.  Upon the fourth
offense, the employee receives a final written warning.  Any employee who commits a
disciplinary offense while on final written warning is subject to termination.  (Murphy
Decl., Ex. B, Boyette Decl., Ex. U, Pelliccione Dep., p. 8; Murphy Decl., Ex. G, Boyette
Decl., Ex. R, Moebius Dep., p. 19; Murphy Decl., Ex. H, Boyette Decl., Ex. S, Dallman
Dep., p. 22.)

orthopedic surgeon.  (St. Cyr Dep., p. 17-18.)  He diagnosed Plaintiff with bilateral knee

degenerative arthritis, and determined that she would need total joint replacement

surgery, which would keep her out of work for six to twelve weeks.  Plaintiff alleges that

she went to Defendant's Human Resources Department on August 9, 2010 to request

medical leave for her surgery.  (St. Cyr Dep., p. 18.)  She was informed that the Director

of Nursing, Catherine Dallman, would have to approve the leave request.  (St. Cyr Dep.,

p. 18.)  Defendant advised Plaintiff of the proper procedure for requesting leave, and

provided her with the requisite request forms, one of which was to be completed by

Plaintiff's physician.  (St. Cyr Dep., p. 19; Pelliccione Dep., p. 11-12.)  Defendant

contends that Plaintiff never returned the completed FMLA documents.  (Boyette Decl.,

Ex. A, Def. Answer to Interrog. 16; Pelliccione Dep., p. 13.)  However, the record

includes a "Certification of Health Care Provider (FMLA and NJFLA)" that appears to

have been signed by Nazarian on August 26, 2010.  (Murphy Decl., Ex. R.)[2]  Part B of

this form appears to be a medical certificate in support of disability benefits, also

completed by Plaintiff's physician and dated August 26, 2010, the date of her surgery.

(Id., Boyette Decl., Ex. V.)

On August 17, 2010, Plaintiff presented Dallman and Jacqueline Pelliccione,

Human Resources Director, with an August 16, 2010 note from Dr. Nazarian detailing

Plaintiff's need for medical leave beginning August 26, 2010 as a result of her upcoming

knee surgery.  (St. Cyr Dep., p. 22.)  The note also stated, "any assistance you could

---

[2]Indeed, Plaintiff testified that the nurses in Nazarian's office informed her that
the doctor would not sign off on such forms until the day of surgery.  (St. Cyr Dep., p.
21.)

3

provide Ms. St. Cyr with her disability at this time would be both appreciated and appropriate." (Murphy Decl., Ex. P, Boyette Decl., Ex. C.)  Dallman signed off on Plaintiff's Request for Leave of Absence form that day.  (St. Cyr Dep., p. 22-23, 132-34; Dallman Dep., p. 14.)  At that time, Dallman also signed off on a Time-Off Request Form submitted by Plaintiff, requesting fifteen hours off from work on August 24 and 25. (Boyette Decl., Ex. G.)

Plaintiff alleges that Dallman called her at home that evening and indicated that if Plaintiff was going to take three months of leave, as opposed to six weeks, Plaintiff should indicate as much so Dallman could hire a replacement.  Plaintiff informed Dallman that she was to be evaluated six weeks post-surgery, and her doctor would make a determination at that time.  (St. Cyr Dep., p. 42-43; 127-28.)

On Wednesday, August 18, 2010, Plaintiff alleges that upon completing her rounds, she went to the sitting room, where a co-worker, Francine Allen, was watching a program on the Black Entertainment Television ("BET") network.  Plaintiff sat down and after her co-worker left the room, remained in the sitting room with the television tuned to BET.  (St. Cyr Dep., p. 24-25.)  She has testified that her legs were hurting, so she took two pain tablets and sat down to wait for the medicine to take effect.  (St. Cyr Dep., p. 26.)  Shortly thereafter, Ms. Allen left the Unit to pick up food she had gotten delivered to the front desk.  (St. Cyr Dep., p. 26.)  At that point, Plaintiff acknowledges she was responsible for watching all 32 residents.  (St. Cyr Dep., p. 126.)

At approximately 11 p.m. on August 18, Reflections Coordinator and Plaintiff's direct supervisor Kelly Moebius entered the resident lounge and found Plaintiff alone watching television; at the time, two residents were wandering around the Reflections

Unit.  (Moebius Dep., p. 11.)  When Moebius inquired as to whether Plaintiff thought the programming she was watching was appropriate for the residents, Plaintiff responded to the effect that "They don't watch it; it doesn't matter what is on."[3]  (Moebius Dep., p. 21; St. Cyr Dep., p. 43-45.)  At that time and up to Plaintiff's termination date, Moebius did not know that Plaintiff intended to take medical leave.  (Moebius Dep., p. 10-12.)  Moebius reported this incident to Pelliccione, who had also witnessed Plaintiff as she continued to watch television with her feet propped up on a chair.  (Moebius Dep., p. 10.)  Pelliccione said, "Hello," and Plaintiff responded, "Hi," and continued to watch the show.

Plaintiff contends she worked without incident on August 19 and 20, 2010.  (See Boyette Decl., Ex. Q; St. Cyr Dep., p. 32, 157-58.)  On Monday, August 23, 2010, however, Plaintiff alleges that one of her co-workers informed her that Morales had left a message that Plaintiff should go back home and come in the following day to talk.  (St. Cyr Dep., p. 32-33.)  On Tuesday, August 24, 2010, in a meeting with Moebius, Pelliccione, and Morales, Plaintiff was terminated.  (St. Cyr Dep., p. 34.)  The reason given was that while she was on "final written warning" for having two previous write-

---

[3]In the briefing, Plaintiff makes much of the fact that she was watching "The Mo'Nique Show," programming which she did not deem age-inappropriate, especially considering the guests featured on August 18, 2010, Lou Gossett Jr. and Anita Baker. (Boyette Decl., Ex. I, J, K.)  Although there is no written rule in the record, other employees have testified that the Defendant's policy was that limited programming was deemed age appropriate: American Movie Classics, Turner Classic Movies, Channel 64, and old westerns.  (Moebius Dep., p. 40; Pelliccione Dep., p. 37-38; Murphy Decl., Ex. W, Allen Dep., p. 10, 25; Murphy Decl., Ex. X, Belle Dep., p. 6-7.)

Plaintiff also testified that she has seen others watching television during their shifts without repercussion.  (St. Cyr Dep., p. 38-40, 93.)  Moebius could think of no other employee who was ever disciplined for having an age-inappropriate show on television.  (Moebius Dep., p. 42.  See also Belle Dep., p. 7.)

ups and working subject to the Reinstatement Agreement, Plaintiff was in the sitting room watching BET, an age-inappropriate channel for the Unit, when she should have been watching residents, two of whom were wandering around the Unit.  (Murphy Decl., Ex. S, Boyette Decl., Ex. H; St. Cyr Dep., p. 35-36.)  Morales has testified that she did not believe this was the type of incident for which an employee should have been terminated.  (Murphy Decl., Ex. E, Boyette Decl., Ex. W, Morales Dep., p. 35.)

Plaintiff filed the Complaint in this matter on November 11, 2010.  The Defendant has now moved for summary judgment, arguing that it had legitimate reasons, unrelated to Plaintiff's request for FMLA leave and unrelated to Plaintiff's alleged disability and race, for terminating Plaintiff's employment, and Plaintiff has presented no evidence that such non-discriminatory reasons were pretextual.  Plaintiff opposes the motion.

## Discussion

### A.  Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law."  Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(a).  The Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Andersen, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322.  That is, the movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party cannot produce admissible evidence to support the [alleged dispute of] fact."  Fed. R. Civ. P. 56(c)(1)(B); accord Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Credibility determinations are the province of the factfinder.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

**B.    The Family and Medical Leave Act**

1.    Generally

The Family and Medical Leave Act of 1993, 29 U.S.C. §  2601, ("FMLA") was enacted to provide leave for workers whose personal or medical circumstances require that they take time off from work in excess of what their employers are willing or able to provide.  Victorelli v. Shadyside Hosp., 128 F.3d 184, 186 (3d Cir. 1997) (citing 29 C.F.R. §  825.101). The Act is intended "to balance the demands of the workplace with the needs of families . . . by establishing a minimum labor standard for leave" that lets employees "take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse or parent who has a serious health condition." Churchill v. Star Enters., 183 F.3d 184, 192 (3d Cir. 1999) (quoting 29 U.S.C. §  2601(b)(1), (2)).

The FMLA guarantees eligible employees 12 weeks of leave in a one-year period following certain events: a serious medical condition; a family member's serious illness; the arrival of a new son or daughter; or certain exigencies arising out of a family member's service in the armed forces.  29 U.S.C. §  2612(a)(1). During the 12 week leave period, the employer must maintain the employee's group health coverage. §  2614(c)(1). Leave must be granted, when "medically necessary," on an intermittent or part-time basis. §  2612(b)(1). Upon the employee's timely return, the employer must reinstate the

8

employee to his or her former position or an equivalent. § 2614(a)(1). The Act makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of" these rights, § 2615(a)(1); to discriminate against those who exercise their rights under the Act, § 2615(a)(2); and to retaliate against those who file charges, give information, or testify in any inquiry related to an assertion of rights under the Act, § 2615(b). Violators are subject to payment of certain monetary damages and appropriate equitable relief, § 2617(a)(1). The Act provides for liquidated (double) damages where wages or benefits have been denied in violation of the Act, unless the defendant proves to the court that the violation was in good faith.

To evoke the requirement for unpaid FMLA leave, an eligible employee need not specifically assert his rights under the Act, or even mention the Act itself. 29 C.F.R. § 825.208(a)(2). All that is required is that the employee state an FMLA qualified reason for the leave. Id. "[T]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.'" Holpp v. Integrated Commc'ns Corp., Civ. No. 03-3383, 2005 WL 3479682, at *5 (D.N.J. December 20, 2005) (quoting Brohm v. JH Props., 149 F.3d 517, 523 (6th Cir. 1998)) (emphasis added). Moreover, 29 C.F.R. § 825.302(c) requires an employer to "inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken." 29 C.F.R. § 825.302(c) (2006). "In all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as FMLA qualifying, based on information provided by the employee." Id. § 825.208(a). The designation generally must be made before the leave starts, but only in limited

9

circumstances can leave be designated as FMLA-protected after it has ended, usually within two business days.  Id. § 825.208(e).

Pursuant to the FMLA and its implementing regulations, "when an employee provides notice of the need for FMLA leave, the employer shall provide the employee with notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations."  29 C.F.R. § 825.301(b)(1).  This notice should contain, for example, whether the leave counts against the FMLA entitlement, whether the employee is required to provide medical certification of a serious health condition and the consequences for failure to do so, any requirement to provide a fitness for duty certificate upon restoration of employment, and the right to the same position at the end of the leave.  Id.  The employer should request certification, in most cases, prior to or immediately after leave commences, but may do so some time thereafter if there is reason to question the reason for the leave or its duration.  Id. § 825.305.

Although employers may adopt or retain leave policies more generous than any policies that comply with the requirements under the FMLA, 29 U.S.C. § 2653, the "rights established by the Act may not be diminished by any employment benefit program or plan," 29 C.F.R. § 825.700.

2.   Interference

An employer interferes with the exercise of an employee's right to unpaid leave if it fails to provide the employee who gives notice of the need for leave a written notice detailing the specific expectations and obligations of the employee and explaining any consequence of a failure to meet these obligations.  See 29 U.S.C. § 2615(a)(1); Parker v.

10

Hahnemann University Hosp., 234 F. Supp. 2d 478, 483 (D.N.J. 2002).  Further,

conduct discouraging employees from taking FMLA leave has been held to constitute

interference, even if the employee ends up taking the leave.

      3.    Retaliation

Pursuant to the FMLA, "[i]t [is] unlawful for any employer to interfere with,

restrain, or deny the exercise of or the attempt to exercise, any right provided under this

subchapter." 29 U.S.C. § 2615(a)(1).  It follows that the FMLA makes it "unlawful for any

employer to discharge or in any other manner discriminate against any individual for

opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2).  But

where an employee is discharged during a protected leave for a reason unrelated to the

leave, there is no right to reinstatement.  Conoshenti v. Public Service Elec. & Gas Co.,

364 F.3d 135, 141 (3d Cir. 2004) (citing 29 C.F.R. § 825.216(a)(1)).

In cases alleging retaliation in the employment setting, courts generally apply the

familiar burden-shifting framework established in McDonnell Douglas Corp. v. Green,

411 U.S. 792 (1973). See Weston v. Pennsylvania, 251 F.3d 420, 432 (3d Cir. 2001).  The

first step under McDonnell Douglas, is to establish a prima facie case of retaliation for

requesting FMLA leave. 411 U.S. at 802.  To carry this initial burden in a retaliation case,

a plaintiff must show that: (1) she engaged in protected activity (requesting FMLA leave);

(2) she suffered an adverse employment decision; and (3) the adverse decision was

causally related to the leave.  Cognoscenti, 364 F.3d at 146-47.  A causal connection may

be established by circumstantial evidence, such as temporal proximity, a pattern of

antagonism, and pretext.  Kachmar v. SunGard Dadt Sys., 109 F.3d 173, 177 (3d Cir.

1997).  This indirect evidence is to "be considered with a careful eye to the specific facts

and circumstances encountered." <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 279, n.5 (3d Cir. 2000).

      Once a prima facie case is established, the burden of persuasion shifts back to the defendant to put forth "a legitimate, nondiscriminatory reason" for the employment decision. <u>Id.</u>; <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981).  If the defendant succeeds in demonstrating that the decision was based on a non-discriminatory reason, Plaintiff has the burden of proving by a preponderance of the evidence that the stated reason was pretextual.  <u>Burdine</u>, at 260; <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 508 (1993).

      In evaluating employment cases, the task of the Court is not to second-guess employment decisions, but is instead to determine whether the employment decisions were motivated by an illegal discriminatory purpose.  <u>Ezold v. Wolf, Block, Schorr & Solis-Cohen</u>, 983 F.2d 509, 525-27 (3d Cir. 1992).  Thus, to establish pretext, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.  Rather, the . . . plaintiff must demonstrate such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employers's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer' did not act for [the asserted] nondiscriminatory reasons."  <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d Cir. 1994) (internal citations omitted); <u>Romano v. Brown & Williamson Tobacco Corp.</u>, 665 A.2d 1139, 1143-44 (N.J. Super. Ct. App. Div. 1995) (citing <u>Fuentes</u>, 32 F.3d at 764-65).

12

"[F]iring an employee for [making] a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009).  On the other hand, an employer is not required to suspend its termination proceedings just because the employee requests medical leave.  See, e.g., Clark County Sch. Dist. v. Breeden , 532 U.S. 268, 272 (2001).  "A contrary holding might impede employers from permissible terminations and encourage employees aware of an impending termination to attempt to create their own 'severance package.'" Windfelder v. The May Dep't Stores Co., 93 Fed. Appx. 351, 355 (3d Cir. 2004).

    4.   Analysis

Defendant states that it did not act in an antagonistic manner in response to Plaintiff's request for leave.  In fact, leave was granted, so there was no "interference." The timing of Plaintiff's termination, however, is suspect.  She was terminated just two days before she was to start FMLA leave.  An inference of retaliation exists when an employee is terminated shortly after engaging in protected activity.  Alone, temporal proximity may not be enough to defeat summary judgment when the temporal relationship is not unusually suggestive or is too attenuated to create a genuine issue of fact.  See Farrell, 206 F.3d at 280 (citing Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)).  However, "[w]here the temporal proximity between the protected activity and the adverse action is "unusually suggestive," it is sufficient standing alone to create an inference of causality and defeat summary judgment." LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007).  Courts have found adverse action by employers to be "unusually suggestive" where, for example, a plaintiff was

13

discharged two days after his employer received his EEOC claim.  See, e.g., Jalil v. Avdel Corp., 873 F.2d 701 (3d Cir. 1989).  Plaintiff argues that the timing of the adverse action is unduly suggestive of retaliation, and whether Defendant was unlawfully motivated to terminate her calls for factual and credibility determinations which are the province of the fact finder.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).  The Court agrees.  Therefore, summary judgment will not be granted on this count of the Complaint.

**C.     Disability Discrimination under the NJLAD**

      1.     Discriminatory Termination

The NJLAD prohibits employers from discriminating against employees on the basis of a disability or a perceived disability, as defined by the statute.  N.J. Stat. Ann. § 10:5-4; Andersen v. Exxon Co. U.S.A., 446 A.2d 486 (N.J. 1982).  Analysis of claims made pursuant to the NJLAD generally follow the analysis of Title VII claims.  Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 498 (3d Cir. 1999).  Under Title VII, it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2.  The framework announced in McDonnell Douglas, 411 U.S. 792, governs Title VII claims, and, by extension, claims under the NJLAD.

As previously explained above, under the McDonnell Douglas burden shifting paradigm, an employee must first establish by a preponderance of the evidence a prima facie claim of discriminatory discharge.  For disability discrimination claims arising under the NJLAD, this is established by showing (1) that Plaintiff was handicapped, (2)

14

that she was otherwise qualified to perform the essential functions of the job, with or without the accommodation by the employer, and was performing at a level that met the employer's expectations, (3) that she nevertheless was fired, and (4) that the employer sought someone to perform the same work after she left. Muller v. Exxon Research & Eng'g Co., 786 A.2d 143, 147-48 (N.J. Super. Ct. App. Div. 2001) (citing Clowes v. Terminix Int'l, Inc., 538 A.2d 794 (1988)).

To determine whether a plaintiff has established she is handicapped, courts look to N.J. Stat. Ann. § 10:5-5(q), which defines "handicapped" as:

> suffering from physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness including epilepsy, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment, deafness or hearing impediment, muteness or speech impediment or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device, or from any mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques. Handicapped shall also mean suffering from AIDS or HIV infection.

Thus, pursuant to the statute, there are two specific categories of handicap: physical and non-physical. Viscik v. Fowler Equipment Co., 800 A.2d 826, 834 (N.J. 2002). "Where the existence of a handicap is not readily apparent, expert medical evidence is required." Id. at 835 (citations omitted). Notably, the term "handicapped" under the NJLAD is not restricted to the type of "severe" or "immutable" disabilities of the Americans with Disabilities Act (ADA), but has been interpreted as significantly broader than the ADA provision. Failla v. City of Passaic, 146 F.3d 149, 154 (3d Cir. 1998) (noting that LAD provides a "lower standard" than ADA because "the LAD definition of 'handicapped' does

15

not incorporate the requirement that the condition result in a substantial limitation on a major life activity").

Again, once the employee establishes a prima facie case of disability discrimination, the burden shifts to the employer to proffer a legitimate non-discriminatory reason for the termination.  If the defendant employer is able to do so, the plaintiff must show by a preponderance of the evidence that the reasons offered by the defendant were not its true reasons, but were actually a pretext for discrimination.

  2. <u>Failure to Accommodate</u>

An employer "must make a reasonable accommodation to the limitations of an employee or applicant who is a person with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship."  N.J. Admin. Code tit. 13, § 13-2.5.  This duty to accommodate, however, is subject to an exception, "where it can reasonably be determined that an . . . employee, as a result of the individual disability, cannot presently perform the job even with reasonable accommodation."  N.J. Admin. Code tit. 13, § 13-2.8(a).  Thus, to assert a prima facie case of disability discrimination in the form of failure to accommodate or discriminatory termination, the plaintiff must demonstrate that he was otherwise qualified to perform the essential functions of the job, either with or without accommodation.  <u>See</u> <u>Victor v. State</u>, 4 A.3d 126, 142 (N.J. 2010) (citing <u>Clowes</u>, 538 A.2d at 805-06).

  3. <u>Analysis</u>

Plaintiff has not proven she was handicapped.  Plaintiff testified that her disability was the arthritis in both knees that sometimes pained her to walk and occasionally caused her to stumble, but both problems were resolved when she took her medication.

(St. Cyr Dep., p. 50-52.)   She put forth no expert medical evidence to bolster a claim that she was handicapped at any time prior to her termination.  Further, Plaintiff never requested an accommodation.  In fact, the record makes clear that Plaintiff did not need an accommodation, aside from the leave she sought to obtain post-surgery.  See St. Cyr Dep., p. 24 (Plaintiff was able to perform all her job duties.); 37 (On the night she sat down because her legs hurt, Plaintiff did not notify anyone she was in pain.); 52 (When asked whether she ever requested any assistance from her supervisors for her arthritis, Plaintiff responded, "No, no, no.  I didn't really need it.  I didn't need assistance.  I was able to do my work."); 67-69 (Plaintiff did not request accommodations, but did request leave for her surgery.).  As such, Plaintiff has not made out a prima facie case of disability discrimination, and summary judgment must be granted on her claims of discriminatory discharge and failure to accommodate.

## D.    Racial Discrimination

Again, discrimination claims brought under the NJLAD are analyzed under the McDonnell Douglas burden-shifting framework.  The elements of a prima facie case of racial discrimination are that (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position she held; (3) the plaintiff suffered an adverse employment action; and (4) similarly situated persons who are not members of the protected class were treated more favorably or the circumstances of plaintiff's termination give rise to an inference of discrimination.  Kimble v. Morgan Properties, 241 Fed. App'x 895, 897–98 (3d Cir. 2007).  The first and third prongs are not in dispute.

As to whether Plaintiff was qualified for the position held, pursuant to Defendant's Progressive Discipline Policy, Plaintiff was on final written warning and subject to

17

immediate termination for any disciplinary offense.  Additionally, with regard to the
fourth prong, the record shows that Plaintiff was replaced by another African-American
woman, Sharon Cooper.  (Murphy Decl., Ex. V, Boyette Decl., Ex. F.)  Plaintiff
acknowledges that no comments were ever made about her race.  (St. Cyr Dep., p. 36, 37,
49.)  The only reason Plaintiff has implicated race in Defendant's decision is the reference
to BET.  (St. Cyr Dep., p. 49.)  Considering all the circumstances of the case, this is not
enough to give rise to an inference of racial discrimination to support a prima facie case.

Even if the Court were to assume Plaintiff could show a prima facie case of racial
discrimination,

> in answering the overarching question of whether the employer's proffered
> non-discriminatory reason for discharge was pretextual, the fact-finder is
> required to consider the employee's performance or other qualities in light
> of the employer's subjective standards, including work ethic.  In that
> respect, the employer's subjective decision-making may be sustained even if
> unfair.

Viscik, 800 A.2d at 838 (internal citations omitted).  The record indicates that the
employer's standards in the area of work ethic were not met.  The Court does not see race
associated at all with the decision to terminate the Plaintiff in this case, even
inferentially.  Accordingly, summary judgment will be granted in favor of the defense on
the claim of racial discrimination.

## Conclusion

For these reasons,

As well as those articulated on the record May 15, 2012,

IT IS ORDERED this 20th day of June, 2012 that Defendant's Motion for Summary
Judgment [18] is hereby GRANTED IN PART and DENIED IN PART, in that

Summary judgment is granted in favor of Defendant on Plaintiff's claims of wrongful termination due to disability discrimination, failure to accommodate, and wrongful discrimination due to race discrimination, but Defendant's motion for summary judgment is denied as to Plaintiff's FMLA claims.

Further, as the Court has reviewed Plaintiff's Affidavit in Opposition to this Motion for Summary Judgment,

IT IS FURTHER ORDERED that Plaintiff's Motion for Leave to File a Sur-Reply to vouch for the Affidavit [25] is hereby <u>DISMISSED AS MOOT</u>.

 /s/ Joseph H. Rodriguez  
JOSEPH H. RODRIGUEZ  
U.S.D.J.
